UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 04-10230-JLT |
| | ) | |
| v. | ) | |
| | ) | |
| CHARLES PATEL, JR. | ) | |
| a/k/a CHANDRAKANT PATEL, JR. | ) | |
| a/k/a CHANDU PATEL | ) | |
| a/k/a CHANDO PATEL | ) | |

GOVERNMENT'S REQUEST THAT COURT
FIND PATEL COMPETENT TO STAND TRIAL

The government submits this memorandum in support of its request that the Court find the defendant, Charles Patel, competent to stand trial.

Since his indictment, in 2004, Patel has claimed to be suffering from dementia caused by Alzheimer's disease. He has retained a psychiatrist, Dr. Rogoff, who has concluded, based on Patel's claimed inability to recall any events relating to the charges against him, that Patel is not competent to stand trial. See D. 35-36.[1] At the joint request of the parties, the Court appointed Dr. Russell Vasile to conduct a competency evaluation, and Dr. Vasile, in turn, retained Dr. Mark Greenberg to do neuropsychological testing. Dr. Vasile's clinical evaluation found no evidence of metal illness; rather, this evaluation, as well as Dr. Greenberg's extensive testing, revealed that Patel is "malingering," or faking, the dementia that he claims impairs his memory. These expert opinions are entirely consistent with Patel's past history of claiming dementia

---

[1] Docket entries will be cited as "D. ___."

while operating business, executing bank fraud schemes, and fleeing home detention. The government therefore asks the Court to find that Patel is competent to stand trial.

    A.    <u>The Competency Evaluation</u>

        1.    <u>Dr. Vasile's psychiatric evaluation</u>

Dr. Vasile interviewed Patel in January and April, 2007. In his June 8, 2007 report to the Court, Dr. Vasile first concludes that Patel is not mentally ill:

> In my clinical judgment there is no evidence of mental illness that would impair Mr. Patel's ability to cooperate rationally with his attorney. There is no evidence of psychosis, paranoia, major depression, mood disorder or agitated behavior that would in any way preclude his ability to establish a collaborative relationship with his attorney.

Vasile Rpt. at 11. Dr. Vasile notes, however, that the absence of mental illness does not necessarily resolve the competency question. <u>Id.</u>

Dr. Vasile then discusses the question of whether Patel is malingering, or faking, his claimed memory loss:

> It is noteworthy that the issue of Mr. Patel malingering cognitive dysfunction has been raised by the government. The basis of this allegation relates to Mr. Patel's observed conduct related to business dealings and other legal proceedings from 2003-2006. The observed behavior appeared to be entirely inconsistent with a dementia that was asserted to have had its onset several years before around 2000-2001.

<u>Id.</u> Dr. Vasile agreed with the defense expert, Dr. Rogoff, that the best way to assess the legitimacy of Patel's claimed memory loss was through neuropsychological testing, which Dr. Vasile asked Dr. Greenberg to perform.

        2.    <u>Dr. Greenberg's testing</u>

Dr. Greenberg performed eight hours of objective testing on Patel in March and April,

2007.  In a 14-page report analyzing and summarizing the results of this testing, Dr. Greenberg explains in detail his conclusion that Patel does not suffer from Alzheimer's disease or some other form of dementia but is, rather, malingering, or faking, his claimed impairment.  Among Dr. Greenberg's conclusions are:

- Though superficially cooperative with the examination, Mr. Patel was clearly not putting forth his best effort on cognitive testing.  His self-presentation and pattern of psychometric responses was simply not credible.  His testing profile was riddled with inconsistent patterns of responding, atypical and at times ludicrous responses.  Greenberg Rpt. at 3.

- As described in the automated VIP report, "This finding is unusual even for individuals with significant cognitive impairment and is consistent with the determination that he intentionally chose the incorrect responses."  Id. at 7-8.

- In the context of his indictment on criminal charges, his past anti-social conduct, and the obvious potential personal gain for currently being deemed incompetent to stand trial, <u>it was concluded with a reasonable degree of professional certainty that Mr. Patel is now actively malingering. That is, he is consciously suppressing his true abilities and exaggerating impairment</u>.  Id. at 3 (emphasis added).

    3.    <u>Dr. Vasile's conclusions</u>

Dr. Vasile's report concludes that the results of his own psychiatric evaluation and Dr. Greenberg's testing "are consistent with malingered cognitive deficits in the service of establishing a diagnosis of dementia" – in other words, Patel was faking memory impairment so that he would be diagnosed as suffering from dementia and would be found not competent to stand trial.  Vasile Rpt. at 13.  Because of Patel's pattern of not responding to questions about his ability to assist in his defense, however, Dr. Vasile was unable to definitively establish Patel's competence to stand trial.  Id.  Dr. Vasile adds: "In my judgment this failure to elaborate responses to my questions is consistent with the pattern of malingered responses described above."  Id.  Dr. Vasile concludes that he "therefore must leave the final decision as to Mr.

3

Patel's competence to stand trial in the hands of the court."[2]  Id.

    B.    Patel's History of Feigned Dementia

Dr. Vasile's and Dr. Greenberg's conclusion that Patel is faking dementia is consistent with Patel's pattern of claiming incompetence when appearing in court in this case, while simultaneously operating business, executing bank fraud schemes, and fleeing home detention.

    1.    Patel's statements to pretrial services and the Court

At his August 11, 2004 initial appearance in this case, Patel told the pretrial services officer who interviewed him, and reiterated to the Court, through counsel, that he was so debilitated by dementia (likely caused by Alzheimer's disease, he claimed) that he could not function on his own, was under his wife's constant care, could travel only under the care of his cousin Gary Patel, and could perform no more than the menial job of superficially looking at hotel rooms to determine if they were clean.[3]  Based on these representations, his counsel made the reasonable suggestion, with which the government agreed, that $20,000 cash bail would be sufficient to ensure that he appeared for future proceedings.  The parties and the Court also agreed that it appeared that Patel needed a competency evaluation to determine whether the case could proceed.

---

[2] Of course, the decision about a defendant's competence is fundamentally a legal one and is therefore always ultimately in the hands of the Court.

[3] Because information in pretrial reports is confidential, the government does not have a copy to attach to this motion and is instead relying on notes that the assistant U.S. Attorney took during a review of the report.

    2.    <u>Reality</u>

        a.    <u>San Francisco Probation</u>

Shortly after Patel's initial appearance, FBI Special Agent Debra Robbins spoke to San Francisco Federal Probation Officer Esther Davis, who had been supervising Patel for two years, following the end of his prison sentence for bankruptcy fraud. As is described in the FBI 302 of that interview (Attached as "Davis 302"), Davis said that she had met Patel in person twice and spoken to him approximately 12 times during the past two years. She also met with him in person on August 13, 2004, for an exit interview, because his probation finished on August 16.

Patel told Davis that he worked as the vice president of construction for Fiesta Fresh Mexican Grill and gave Davis copies of his pay stubs. Patel never mentioned, nor did Davis observe, any problems with memory impairment or dementia. Davis never met, or had any dealings with Patel's wife.

        b.    <u>Rockport National Bank</u>

On August 26, 2004, Special Agent Robbins interviewed Maryann Bland, the vice president of commercial lending for Rockport National Bank, in Rockport, Massachusetts (attached as "Bland 302"). Bland explained that, in the Fall, 2003, she met with a California businessman, "Chandan" Patel (who used the nicknames "Charles" and "Chuck"), about financing his purchase of a Gloucester, Massachusetts restaurant called McT's Lobster House and Tavern. In December, 2003, after extensive negotiation with "Chandan" Patel and his attorney, the bank executed two loans for the purchase of the restaurant's property and assets and a $900,000 line of credit agreement.

After closing the financing deal with the bank, "Chandan" Patel remodeled McT's and

opened it for business in February, 2004. From that time until September, 2004, Bland stopped by the restaurant several times a week, and during the majority of those visits, "Chandan" Patel was there. He ran the restaurant and handled its banking, according to Bland, who described him as intelligent, knowledgeable, and charming.

At some point after Patel's initial appearance on August 11, 2004, Bland read the U.S. Attorney's Office's press release describing his bank fraud indictment and became concerned that Charles Patel, Jr. and "Chandan" Patel might be the same person. So Bland asked "Chandan," both over the phone and in person, if he was the same Charles Patel that had been indicted; both times, he lied and said that he was not – that the Charles Patel in the indictment was his cousin. But shortly thereafter, FBI agents gave Bland a copy of the mug shot that the Marshal's Service took of Patel on the day of his initial appearance, and Bland recognized the person in the picture as the bank's customer, "Chandan" Patel. The bank then drafted a letter demanding that Patel immediately close his accounts; Bland brought the letter to McT's restaurant, where she confronted Patel with the mugshot and asked him to sign the letter; and Patel acquiesced and agreed to sign the letter.

Chandan Patel is, in fact, Charles Patel's sister, who was interviewed by the FBI and said that she had no involvement with McT's Lobster House or Rockport National Bank. During the course of obtaining the mortgage and loan from Rockport National Bank, Patel provided the bank a California drivers license with what appears to be his photograph, the name "Chandan Patel," a birth date in 1956, and an address of in Dublin, CA. Chandan Patel confirmed that the name and information on this drivers license is hers but that the photograph is of Charles Patel. It is clear, therefore, that Patel used his sister's identity to obtain a fake driver's license, and then

used the fake license and phony identity to borrow almost $1 million from Rockport National Bank. He continued this bank fraud scheme after his August 11, 2004 arraignment (during which he claimed to be incompetent) until the bank discovered the fraud and took steps to end its relationship with him.

    2.    Patel's flight

On September 7, 2004, after discovering Patel's ongoing bank fraud, the government filed a motion asking the Court to revoke Patel's release or revise his release conditions. Dkt. #7. In a September 22, 2004 Order, Magistrate Judge Collings denied the request to revoke Patel's release but revised his release conditions to include home detention with electronic monitoring, forthwith. Dkt. #9. The pretrial services officer in California repeatedly tried to contact Patel to implement the electronic monitoring, but she could not reach Patel, and his wife, Reema, said that she did not know where he was. Ultimately, Pretrial Services reported Patel's non-compliance to the Court, which issued an arrest warrant.

On October 14, 2004, in an effort to locate the defendant, a California FBI agent interviewed Reema Patel and Michael Patel, the defendant's brother. Both said that they had not seen Charles Patel in approximately a month, did not know where he was, but would contact the FBI agent if Charles contacted them. Neither of them ever did.[4]

In September 2005, Steven Alikakos, of Toronto, Canada, contacted the U.S. Attorney's Office to inquire whether the Chuck Patel, with whom he had had a business meeting in July,

---

[4] That neither Reema nor Michael Patel ever contacted the FBI means one of two things: either Charles continued to live with his family during his fugitive period and they chose not to report him (in which case their statements about his dementia should clearly be dismissed as not credible), or Charles lived apart from his family for more than a year as a fugitive (in which case he is certainly not incapacitated).

2005, was the Charles Patel that had been indicted in this district. Alikakos had learned of the indictment while doing a Google search on Patel (Alikakos 302 attached). An FBI agent then spoke to Alikakos and e-mailed him Patel's booking photo, which Alikakos identified as the Chuck Patel he had met. Alikakos, a commercial real estate agent, said that the meeting was to discuss Patel's interest in opening a restaurant in Toronto. When Alikakos asked Patel why he was looking to open a restaurant in Canada, Patel said he was just looking for a change from the U.S., which made Alikakos suspicious. In a second conversation with the FBI agent, Alikakos described Patel as "sharp as a tack" and as having an excellent memory (Alikakos 2nd 302 attached). The FBI attempted to follow up on the limited contact information Alikakos had for Patel but was unable to locate him.

In March, 2006, the U.S. Attorney's Office learned that Patel was scheduled to appear in April for a deposition in a civil lawsuit in Youngstown, Ohio. When Patel did appear on April 10, 2006 for that deposition, he was arrested.

    C.    <u>Conclusion</u>

Dr. Vasile's and Dr. Greenberg's expert evaluations of Patel are entirely consistent with the pattern of behavior described above and documented in the attached FBI 302s. Since the time of his indictment in 2004, Patel has claimed to be largely incapacitated by Alzheimer's disease. All the while, he orchestrated a bank fraud scheme that allowed him to borrow almost $1 million and to run a restaurant in Gloucester, he fled the country rather than submit to home detention and electronic monitoring, and he had business meetings about opening a restaurant in Toronto. These actions confirm Dr. Vasile's and Dr. Greenberg's conclusions that Patel is malingering, or faking, dementia, in an effort to persuade the Court that he is not competent.

The government asks the Court to see through this ruse and find Patel competent to stand trial.

                                                    Respectfully submitted,

                                                    MICHAEL J. SULLIVAN
                                                    United States Attorney

                              By:    /s/ Adam Bookbinder
                                                    Adam J. Bookbinder
                                                    Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

      I certify that this document filed through the ECF system, which will provide electronic notice to counsel as identified on the Notice of Electronic Filing.

                                                      /s/ Adam J. Bookbinder
                                                      Adam J. Bookbinder

Dated: August 27, 2007

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 04-10230-JLT |
| v. | ) | |
| CHARLES PATEL, JR. | ) | |
| a/k/a CHANDRAKANT PATEL, JR. | ) | |
| a/k/a CHANDU PATEL | ) | |
| a/k/a CHANDO PATEL | ) | |

GOVERNMENT'S REQUEST THAT COURT
FIND PATEL COMPETENT TO STAND TRIAL

The government submits this memorandum in support of its request that the Court find the defendant, Charles Patel, competent to stand trial.

Since his indictment, in 2004, Patel has claimed to be suffering from dementia caused by Alzheimer's disease. He has retained a psychiatrist, Dr. Rogoff, who has concluded, based on Patel's claimed inability to recall any events relating to the charges against him, that Patel is not competent to stand trial. See D. 35-36.[1] At the joint request of the parties, the Court appointed Dr. Russell Vasile to conduct a competency evaluation, and Dr. Vasile, in turn, retained Dr. Mark Greenberg to do neuropsychological testing. Dr. Vasile's clinical evaluation found no evidence of metal illness; rather, this evaluation, as well as Dr. Greenberg's extensive testing, revealed that Patel is "malingering," or faking, the dementia that he claims impairs his memory. These expert opinions are entirely consistent with Patel's past history of claiming dementia

---

[1] Docket entries will be cited as "D. ___."

while operating business, executing bank fraud schemes, and fleeing home detention. The government therefore asks the Court to find that Patel is competent to stand trial.

    A.    <u>The Competency Evaluation</u>

        1.    <u>Dr. Vasile's psychiatric evaluation</u>

Dr. Vasile interviewed Patel in January and April, 2007. In his June 8, 2007 report to the Court, Dr. Vasile first concludes that Patel is not mentally ill:

> In my clinical judgment there is no evidence of mental illness that would impair Mr. Patel's ability to cooperate rationally with his attorney. There is no evidence of psychosis, paranoia, major depression, mood disorder or agitated behavior that would in any way preclude his ability to establish a collaborative relationship with his attorney.

Vasile Rpt. at 11. Dr. Vasile notes, however, that the absence of mental illness does not necessarily resolve the competency question. <u>Id.</u>

Dr. Vasile then discusses the question of whether Patel is malingering, or faking, his claimed memory loss:

> It is noteworthy that the issue of Mr. Patel malingering cognitive dysfunction has been raised by the government. The basis of this allegation relates to Mr. Patel's observed conduct related to business dealings and other legal proceedings from 2003-2006. The observed behavior appeared to be entirely inconsistent with a dementia that was asserted to have had its onset several years before around 2000-2001.

<u>Id.</u> Dr. Vasile agreed with the defense expert, Dr. Rogoff, that the best way to assess the legitimacy of Patel's claimed memory loss was through neuropsychological testing, which Dr. Vasile asked Dr. Greenberg to perform.

        2.    <u>Dr. Greenberg's testing</u>

Dr. Greenberg performed eight hours of objective testing on Patel in March and April,

2007. In a 14-page report analyzing and summarizing the results of this testing, Dr. Greenberg explains in detail his conclusion that Patel does not suffer from Alzheimer's disease or some other form of dementia but is, rather, malingering, or faking, his claimed impairment. Among Dr. Greenberg's conclusions are:

- Though superficially cooperative with the examination, Mr. Patel was clearly not putting forth his best effort on cognitive testing. His self-presentation and pattern of psychometric responses was simply not credible. His testing profile was riddled with inconsistent patterns of responding, atypical and at times ludicrous responses. Greenberg Rpt. at 3.

- As described in the automated VIP report, "This finding is unusual even for individuals with significant cognitive impairment and is consistent with the determination that he intentionally chose the incorrect responses." Id. at 7-8.

- In the context of his indictment on criminal charges, his past anti-social conduct, and the obvious potential personal gain for currently being deemed incompetent to stand trial, <u>it was concluded with a reasonable degree of professional certainty that Mr. Patel is now actively malingering. That is, he is consciously suppressing his true abilities and exaggerating impairment</u>. Id. at 3 (emphasis added).

   3.   Dr. Vasile's conclusions

Dr. Vasile's report concludes that the results of his own psychiatric evaluation and Dr. Greenberg's testing "are consistent with malingered cognitive deficits in the service of establishing a diagnosis of dementia" – in other words, Patel was faking memory impairment so that he would be diagnosed as suffering from dementia and would be found not competent to stand trial. Vasile Rpt. at 13. Because of Patel's pattern of not responding to questions about his ability to assist in his defense, however, Dr. Vasile was unable to definitively establish Patel's competence to stand trial. Id. Dr. Vasile adds: "In my judgment this failure to elaborate responses to my questions is consistent with the pattern of malingered responses described above." Id. Dr. Vasile concludes that he "therefore must leave the final decision as to Mr.

Patel's competence to stand trial in the hands of the court."[2]  Id.

### B. Patel's History of Feigned Dementia

Dr. Vasile's and Dr. Greenberg's conclusion that Patel is faking dementia is consistent with Patel's pattern of claiming incompetence when appearing in court in this case, while simultaneously operating business, executing bank fraud schemes, and fleeing home detention.

#### 1. Patel's statements to pretrial services and the Court

At his August 11, 2004 initial appearance in this case, Patel told the pretrial services officer who interviewed him, and reiterated to the Court, through counsel, that he was so debilitated by dementia (likely caused by Alzheimer's disease, he claimed) that he could not function on his own, was under his wife's constant care, could travel only under the care of his cousin Gary Patel, and could perform no more than the menial job of superficially looking at hotel rooms to determine if they were clean.[3]  Based on these representations, his counsel made the reasonable suggestion, with which the government agreed, that $20,000 cash bail would be sufficient to ensure that he appeared for future proceedings.  The parties and the Court also agreed that it appeared that Patel needed a competency evaluation to determine whether the case could proceed.

---

[2] Of course, the decision about a defendant's competence is fundamentally a legal one and is therefore always ultimately in the hands of the Court.

[3] Because information in pretrial reports is confidential, the government does not have a copy to attach to this motion and is instead relying on notes that the assistant U.S. Attorney took during a review of the report.

    2.    <u>Reality</u>

        a.    <u>San Francisco Probation</u>

Shortly after Patel's initial appearance, FBI Special Agent Debra Robbins spoke to San Francisco Federal Probation Officer Esther Davis, who had been supervising Patel for two years, following the end of his prison sentence for bankruptcy fraud. As is described in the FBI 302 of that interview (Attached as "Davis 302"), Davis said that she had met Patel in person twice and spoken to him approximately 12 times during the past two years. She also met with him in person on August 13, 2004, for an exit interview, because his probation finished on August 16.

Patel told Davis that he worked as the vice president of construction for Fiesta Fresh Mexican Grill and gave Davis copies of his pay stubs. Patel never mentioned, nor did Davis observe, any problems with memory impairment or dementia. Davis never met, or had any dealings with Patel's wife.

        b.    <u>Rockport National Bank</u>

On August 26, 2004, Special Agent Robbins interviewed Maryann Bland, the vice president of commercial lending for Rockport National Bank, in Rockport, Massachusetts (attached as "Bland 302"). Bland explained that, in the Fall, 2003, she met with a California businessman, "Chandan" Patel (who used the nicknames "Charles" and "Chuck"), about financing his purchase of a Gloucester, Massachusetts restaurant called McT's Lobster House and Tavern. In December, 2003, after extensive negotiation with "Chandan" Patel and his attorney, the bank executed two loans for the purchase of the restaurant's property and assets and a $900,000 line of credit agreement.

After closing the financing deal with the bank, "Chandan" Patel remodeled McT's and

opened it for business in February, 2004. From that time until September, 2004, Bland stopped by the restaurant several times a week, and during the majority of those visits, "Chandan" Patel was there. He ran the restaurant and handled its banking, according to Bland, who described him as intelligent, knowledgeable, and charming.

At some point after Patel's initial appearance on August 11, 2004, Bland read the U.S. Attorney's Office's press release describing his bank fraud indictment and became concerned that Charles Patel, Jr. and "Chandan" Patel might be the same person. So Bland asked "Chandan," both over the phone and in person, if he was the same Charles Patel that had been indicted; both times, he lied and said that he was not – that the Charles Patel in the indictment was his cousin. But shortly thereafter, FBI agents gave Bland a copy of the mug shot that the Marshal's Service took of Patel on the day of his initial appearance, and Bland recognized the person in the picture as the bank's customer, "Chandan" Patel. The bank then drafted a letter demanding that Patel immediately close his accounts; Bland brought the letter to McT's restaurant, where she confronted Patel with the mugshot and asked him to sign the letter; and Patel acquiesced and agreed to sign the letter.

Chandan Patel is, in fact, Charles Patel's sister, who was interviewed by the FBI and said that she had no involvement with McT's Lobster House or Rockport National Bank. During the course of obtaining the mortgage and loan from Rockport National Bank, Patel provided the bank a California drivers license with what appears to be his photograph, the name "Chandan Patel," a birth date in 1956, and an address of in Dublin, CA. Chandan Patel confirmed that the name and information on this drivers license is hers but that the photograph is of Charles Patel. It is clear, therefore, that Patel used his sister's identity to obtain a fake driver's license, and then

6

used the fake license and phony identity to borrow almost $1 million from Rockport National Bank. He continued this bank fraud scheme after his August 11, 2004 arraignment (during which he claimed to be incompetent) until the bank discovered the fraud and took steps to end its relationship with him.

      2.    Patel's flight

On September 7, 2004, after discovering Patel's ongoing bank fraud, the government filed a motion asking the Court to revoke Patel's release or revise his release conditions. Dkt. #7. In a September 22, 2004 Order, Magistrate Judge Collings denied the request to revoke Patel's release but revised his release conditions to include home detention with electronic monitoring, forthwith. Dkt. #9. The pretrial services officer in California repeatedly tried to contact Patel to implement the electronic monitoring, but she could not reach Patel, and his wife, Reema, said that she did not know where he was. Ultimately, Pretrial Services reported Patel's non-compliance to the Court, which issued an arrest warrant.

On October 14, 2004, in an effort to locate the defendant, a California FBI agent interviewed Reema Patel and Michael Patel, the defendant's brother. Both said that they had not seen Charles Patel in approximately a month, did not know where he was, but would contact the FBI agent if Charles contacted them. Neither of them ever did.[4]

In September 2005, Steven Alikakos, of Toronto, Canada, contacted the U.S. Attorney's Office to inquire whether the Chuck Patel, with whom he had had a business meeting in July,

---

[4] That neither Reema nor Michael Patel ever contacted the FBI means one of two things: either Charles continued to live with his family during his fugitive period and they chose not to report him (in which case their statements about his dementia should clearly be dismissed as not credible), or Charles lived apart from his family for more than a year as a fugitive (in which case he is certainly not incapacitated).

2005, was the Charles Patel that had been indicted in this district. Alikakos had learned of the indictment while doing a Google search on Patel (Alikakos 302 attached). An FBI agent then spoke to Alikakos and e-mailed him Patel's booking photo, which Alikakos identified as the Chuck Patel he had met. Alikakos, a commercial real estate agent, said that the meeting was to discuss Patel's interest in opening a restaurant in Toronto. When Alikakos asked Patel why he was looking to open a restaurant in Canada, Patel said he was just looking for a change from the U.S., which made Alikakos suspicious. In a second conversation with the FBI agent, Alikakos described Patel as "sharp as a tack" and as having an excellent memory (Alikakos 2nd 302 attached). The FBI attempted to follow up on the limited contact information Alikakos had for Patel but was unable to locate him.

In March, 2006, the U.S. Attorney's Office learned that Patel was scheduled to appear in April for a deposition in a civil lawsuit in Youngstown, Ohio. When Patel did appear on April 10, 2006 for that deposition, he was arrested.

    C.    <u>Conclusion</u>

Dr. Vasile's and Dr. Greenberg's expert evaluations of Patel are entirely consistent with the pattern of behavior described above and documented in the attached FBI 302s. Since the time of his indictment in 2004, Patel has claimed to be largely incapacitated by Alzheimer's disease. All the while, he orchestrated a bank fraud scheme that allowed him to borrow almost $1 million and to run a restaurant in Gloucester, he fled the country rather than submit to home detention and electronic monitoring, and he had business meetings about opening a restaurant in Toronto. These actions confirm Dr. Vasile's and Dr. Greenberg's conclusions that Patel is malingering, or faking, dementia, in an effort to persuade the Court that he is not competent.

The government asks the Court to see through this ruse and find Patel competent to stand trial.

                                                                   Respectfully submitted,

                                                                   MICHAEL J. SULLIVAN
                                                                   United States Attorney

                                By:     /s/ Adam Bookbinder
                                                  Adam J. Bookbinder
                                                  Assistant U.S. Attorney


## CERTIFICATE OF SERVICE

I certify that this document filed through the ECF system, which will provide electronic notice to counsel as identified on the Notice of Electronic Filing.

                                                                  /s/ Adam J. Bookbinder
                                                                Adam J. Bookbinder

Dated: August 27, 2007