UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>Plaintiff, )<br>v. )<br>)<br>CHARLES PATEL, JR. )<br>)<br>Defendant. ) | Criminal No. 04-10230-JTL |

**AFFIDAVIT OF ROBERT L. PEABODY, ESQ. IN SUPPORT OF DEFENDANT'S MOTION TO DETERMINE MENTAL CAPACITY/COMPETENCY OF DEFENDANT**

I, Robert L. Peabody, hereby depose and say:

1. My name is Robert L. Peabody and I am an attorney with the law firm of Nystrom Beckman & Paris in Boston. I am licensed to practice law in the Commonwealth of Massachusetts and am admitted to practice before this Court.

2. I am the attorney representing defendant Charles Patel (Patel) in this federal bank fraud prosecution and was retained by defendant and his family in May 2006. I am familiar with the facts and circumstances of the government's case against Patel and all proceedings that have occurred, to date, in this matter.

**My initial observations of Patel**

3. During my early encounters with Patel, specifically, at his initial appearance before Magistrate Judge Robert B. Collings in May 2006 and, later, in preparation for his detention hearing in June 2006, I was concerned about Patel's detached and confused behavior. In face-to-face meetings with Patel at the Norfolk holding facility before the detention hearing, I discovered that Patel remembered painfully little about the events surrounding his failure to comply with the conditions of

his pretrial release imposed by Magistrate Judge Collings the summer of 2004. Likewise, Patel could not recall or, otherwise, explain to me why he neglected to do anything to reinstate those conditions. As such, I was unable to provide the Court with a credible explanation why Patel ignored the Court's pretrial directives and remained a fugitive the intervening 18 months.[1]

**Dr. Jerome Rogoff retained**

4.      Based upon my early interactions with Patel the summer of 2006 and, especially my efforts to prepare for the detention hearing, I retained Dr. Jerome Rogoff (Dr. Rogoff) to meet with Patel at the Dedham House of Correction and conduct a competency evaluation of him. Dr. Rogoff met with Patel on two occasions the summer of 2006 and prepared a written report that was completed on or about September 26, 2006.

5.      Dr. Rogoff concluded that Patel suffers from Dementia, most likely from Alzheimer's (his father had also suffered from Alzheimer's) at least since 2001, that he is incapable of assisting counsel in defense of the charges against him since "his ability to provide [his attorney] any meaningful, essential information on which to build a defense case is close to nil," and that his condition is not remedial. *Rogoff report at 2, 5.* Accordingly, on September 28, 2006, pursuant to 18 U.S.C. §4241(a) and Fed. R. Crim. P. 12. 2 (c) (1) (A), I moved the Court to conduct a second competency evaluation of Patel, then hold a hearing to determine whether Patel was competent to stand trial in this case.

---

[1] Patel was detained following the hearing and has been in custody ever since.

6.	To date, the Court has received -- in addition to Dr' Rogoff's September 26, 2006 report -- Dr. Russell G. Vasile's (Dr. Vasile) written evaluation of Patel, dated June 8, 2007, as well as the written findings of Dr. Mark S. Greenberg's (Dr. Greenberg) psychological and neuropsychological testing of Patel, dated June 21, 2007.  On August 27, 2007, Patel filed a *supplementary* report prepared by Dr. Rogoff, dated August 1, 2007 that responds to the conclusions of Dr. Vasile and Dr. Greenberg.  Finally, the Court has before it the June 10, 2004 summary report/letter of Dr. William T. Riley, M.D., Patel's psychiatrist in Menlo Park, CA who evaluated and treated Patel for Dementia in March 2004 and prescribed medication to treat his condition.

**This Affidavit**

7.	The purpose of this Affidavit is to give the Court an understanding of my own experiences dealing with Patel in the course of my representation of him since May 2006.  In their own evaluations of Patel, <u>both</u> Dr. Vasile and Dr. Rogoff raise concerns whether Patel "could meaningfully assist his attorney in his defense." *Vasile Report, p. 11*.  They point out Patel's inability to recall and/or talk about anything of substance concerning his alleged "check kiting" activities in 1999.  Dr. Vasile, in particular, noted Patel's "apparent inability to recall meaningful details related to his actions that have led to the indictment against him." *Vasile Report, p. 11*.  As such, questions were raised – evidence of Patel's malingering found by Dr. Greenberg, notwithstanding -- whether Patel's lack of memory would prevent him from assisting me in preparing defenses to the charges or, otherwise, counsel him about resolving this case.

**Charges and alleged conduct**

8.      Patel is charged with two counts of bank fraud, pursuant to 18 U.S.C. §1344 (1).  He is alleged to have engaged in a so called "check kiting" scheme to intentionally defraud several different commercial banks out of more than $170,000 in 1999.[2]  At the time, Patel and his father, Chhituhai Patel (deceased), own and operated several "family style" restaurants located in Boston, Louisiana, and in the Bay Area and utilized various commercial bank accounts around the country to operate these businesses. Since the restaurant business is a "cash" business, Patel's banks extended him "same day" or immediate access to cash, check, and wire deposits made to these accounts on a given day.

9.      The government's claim against Patel is that between December 1998 and February 1999 and, again, from May through November 1999, Patel deposited checks – usually for large amounts and without sufficient funds in the account – from one bank to the other and, often, on the same day.  Since Patel received immediate credit for these deposits, he then wired the recently deposited funds to other commercial accounts under his control (Riggs and Wells Fargo banks), or, simply, wrote checks on the account to pay bills and make other expenditures.

10.     By utilizing "same day" use of deposited funds, Patel took advantage of the two or three day "float" between banks and spent the newly deposited funds <u>before</u> the banks realized that the deposited checks had bounced and Patel's accounts were overdrawn. To ensure continuing access to bank funds and hide deficient balances in these accounts, Patel allegedly continued to write checks to and from these accounts

---

[2] After being informed by one bank that his account was seriously in arrears, Patel repaid $90,000 of the $170,000 owed leaving a current debt of $80,000.

until, finally, the banks realized that Patel's accounts were significantly overdrawn and the banks had suffered a loss. Thereafter, Patel's accounts were frozen and he was summoned to explain the deficiencies and cover the arrears.

**Government's likely proof**

11. The government's case against Patel is a circumstantial case. It must prove that Patel "intended" to defraud the banks by (purposely) overdrawing his accounts, obtaining bank funds during the "float" period, then depositing or wiring these funds into Patel's other bank accounts for his own use -- pay bills, cover expenses, etc. I would expect the government to call an expert (bank analyst) who will give an opinion that both the frequency and size of the deposits made by Patel back and forth between accounts which he wired to other accounts (and spent) during the "float" was conduct consistent with illegal "check kiting" or bank fraud, not a banking oversight unintentionally caused by careless management.

**Questions for Patel**

12. Based on the foregoing, it was my intention early in my representation to meet with Patel to discuss the case with him and review the government 's evidence against him. More importantly, I had questions for Patel about his day-to-day management of the bank accounts at issue during the relevant time frames in 1999; the reason for using multiple operating accounts; his father's (his business partner) role in the management of the accounts; why large deposits were going back and forth between these accounts with such frequency; why large deposits "realized" during the float were being wired to other Patel accounts; and how the wired funds were spent after receipt by Riggs and other commercial banks.

13.     I also had questions for Patel about how the different Patel restaurant businesses were structured, the finances of these businesses, and, most importantly, whether any of the restaurants or other businesses were experiencing cash flow or other financial problems, especially those businesses whose accounts were involved in the alleged check kiting scheme.  Answers to these questions, in my mind, were critical to help me understand the Patel business finances, why Patel (or someone else) conducted the questionable banking activity he has been charged with, and how he allowed one of his commercial accounts to fall $170,000 in arrears – all information critical to devising a strategy to defend Patel.

**Patel's lack of recall**

14.     When I put these and other questions to Patel over the course of several meetings with him he told me that he had no recall or other memory of his day-to-day handling of the bank accounts at issue in 1999. Patel could not tell me whether he, his father, or others were making check deposits to the banks in 1999; whether deposits were being accomplished by mail or by hand; how checks endorsed by Patel could be deposited the same day on different coasts; why, in fact, multiple deposits back and forth between banks were being made to these accounts often the same day, and whether he (or someone else) was directing the banks to wire funds to the Riggs Bank or other Patel commercial accounts.[3]

---

[3] In the Grand Jury presentation, one of the government's witnesses commented that in identifying illegal check kiting, three (3) telltale signs are commonly discernable from bank records – multiple, even number cash deposits; more than 50% of an account's monthly activity reflects deposits back and forth between that and a second account; and a discrepancy, on any given day, between an account's "actual" balance and the "statement" balance. When I reviewed these three factors with Patel and their significance, he could not account for why his accounts bore these particular features in 1999 since he had no memory of the transactions.

15. Hoping that he might recall why, for example, large sums of money were being wired from one account to Riggs Bank, I showed Patel Riggs Bank records for the relevant period listing all "Payees" and amounts received. The "Payees" included, primarily, California based construction companies (concrete, drywall, electricians, plastering), law firms, and restaurant suppliers, yet Patel had no recollection why the Riggs account was used to pay such entities in 1999, the purpose of such payments, or why funds wired in from the accounts in this case were needed, in part, to pay these entities.[4] [5]

**Cash flow problems?**

16. As mentioned above, I was especially interested in understanding from Patel the financial structure of the restaurant businesses and their financial health as of 1999. I also wanted to know about cash balances in other Patel accounts during the same period and whether Patel was experiencing cash flow or other financial problems. To these questions, Patel was similarly unable to recall any specifics (or generalities) about the overall finances of their restaurant operations in 1999 or point to some financial difficulty he, his father, or the operation was experiencing at the time that would have

---

[4] It would appear from the list of Riggs Payees that monies were, possibly, being spent by the Patels to either build, purchase, or finance a new restaurant somewhere on the West coast, however, Patel was unable to say anything definitive on the subject. Certainly, from the names of the listed payees there is no indication that Patel was emptying the Riggs account to purchase expensive cars, boats, or for some other personal benefit.

[5] Riggs Bank account records also show large wire transfers coming from the Union Bank of California into the Riggs account before and during the same period wire transfers were being made from one of the banks in this case. Patel had no recall of having a Union Bank account or why wire transfers were being made from that account to Riggs Bank. Likewise, efforts to collect Union Bank records have been unsuccessful as Union Bank does not have bank records dating back to 1999.

prompted Patel (or someone else) to conduct banking activity at such a frenetic pace and, apparently, utilize the "float" to illegally access more than $170,000 in bank funds.[6]

17.     Answers to these questions were important to me because if Patel's operations were having cash flow problems for whatever reason – drop in business, loan repayments, business expansion -- it might have explained why Patel took advantage of the banks "same day" cash deposit policy to obtain $170,000 in bank funds.  Patel may have thought that securing funds by utilizing the bank float was quicker, easier, and less costly in the short run than borrowing money, especially if he intended to repay the bank once the overdrafts were discovered.  Indeed, had this been the case, I would have been better able to advise Patel that a plea was, likely, the best way to resolve the charges. Fashioning affirmative defenses knowing nothing about company finances would have been difficult.

18.     On the other hand, if Patel's businesses in 1999 were solvent and had sufficient cash balances on hand in his other operating accounts, Patel would have no reason to defraud the banks or kite checks to secure $170,000 in bank funds.  There would already be sufficient funds on hand elsewhere to pay bills or cover unanticipated expenses.  Likewise, any temporary dollar loss suffered because of Patel's banking conduct could quickly be satisfied.  In this instance, I could have advised Patel that he had a defense to the charges that would rebut any intent on his part to "intentionally" defraud the banks. Likewise, I would be in a better position either to negotiate a settlement with the government or, if not, try the case.

---

[6] Patel's lack of recall on these and other topics is complicated further by the fact that his business partner, his father, is deceased, and Patel's other family members -- brother Michael Patel and sister Chandan Patel – had no involvement at all in the family restaurant businesses.

**Forensic accountant retained**

19. Unable to obtain any useful information about Patel's banking and accounting activities in 1999 from Patel, himself, I retained a forensic accountant to review the bank records of the accounts at issue. I asked them to determine whether "holes" existed in the government's check kiting analysis and/or whether Patel had a defense to the charges. After reviewing the evidence in the case, the accountants reported that they needed more information before they could assess (or rebut) the government's opinion that Patel intended to defraud the banks.

20. For example, they asked what the overall financial condition of Patel's restaurant operation and the individual businesses were in 1999. Did Patel have 1999 financial statements or balance sheets for the businesses? Was he experiencing cash flow or other problems in 1999 that would have prompted him to take advantage of the "float" to overdraw his accounts to the extent that he did? Was their an immediate need for funds in early 1999 and later on that year? I told the accountants that I had asked Patel the same questions but because of his Dementia, he was unable to recall or, otherwise, provide me with any of the information sought.

**Conclusion**

21. Based on the foregoing, I believe that Patel is unable to assist me in his own defense. I understand that the competency evaluation process is a psychological analysis and, respectfully, I defer to the physicians and doctors who have evaluated Patel in connection with this motion. However, despite significant effort on both our parts, Patel cannot provide me with information about why the commercial bank accounts inn this case were managed the way they were in 1999 and obtained more than $170,000 in

bank funds. Likewise, Patel cannot shed any light on the financial condition of his businesses back then to help me identify either a motive or, alternatively, a good reason why the charged activity took place. Without more, I am left to defend Patel in this matter completely "in the dark."[7]

    Sworn to under the pains of perjury this 4th day of September 2007.

                                        s/ Robert L. Peabody
                                        Robert L. Peabody

---

[7] For the same reasons noted by Dr. Rogoff in his September 26, 2006 report, I am concerned that Patel lacks the wherewithal to "give informed consent to any decision or course of action" in this case or understand, for example, the factual predicate supporting the charge in this case should, later, he plead guilty. *Rogoff report at 5*.