UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | * |
| | * |
| v. | * |
| | * |
| CHARLES PATEL, JR. | * |
| a/k/a CHANDRAKANT PATEL, JR. | * |
| a/k/a CHANDU PATEL | * |
| a/k/a CHANDO PATEL, | * |
| | * |
| Defendant. | * |
| | * |

Criminal No. 04-10230-JLT

MEMORANDUM & ORDER

November 27, 2007

TAURO, J.

The United States charges Defendant Charles Patel Jr. with two counts of bank fraud in connection with the operation of Defendant's restaurant businesses.  Presently at issue is Defendant's mental competency to stand trial.[1]

In dealing with the competency motions, the court has reviewed the Parties' submissions and medical reports, and reports from the court-ordered psychiatric evaluation.  As well, a Competency Hearing was held on September 20, 2007.  On the basis of this review, the court finds Defendant COMPETENT to stand trial for the following reasons.

**The Indictment**

Defendant Charles Patel Jr. was the Chief Executive Officer of Guacamole's Cantina, Inc.

---

[1] Two motions are currently pending on this issue: (1) Defendant's <u>Motion Pursuant to 18 U.S.C. § 4241(a),(b), and Fed. R. Crim. P. 12.2(c)(1)(A) for a Hearing to Determine the Mental Capacity/Competency of Defendant</u> [Sealed #35] ("Def.'s Mot. for Hr'g"); and (2) the Government's <u>Request that Court Find Patel Competent to Stand Trial</u> [#47] ("Gov't's Request for Competency Finding").

1

and the President of B.N.J. Restaurants, Inc., both California corporations.[2]  In connection with these restaurant businesses, Defendant had a number of commercial bank accounts.[3]  According to the Indictment, from January to February of 1999, Defendant executed a "check-kiting" scheme by writing and depositing sixty-seven checks between his Bank Boston and Wells Fargo accounts resulting in inflated balances at both banks.[4]  During this period, Defendant allegedly transferred money out of these two accounts that he later withdrew as cash or used to pay business expenses.[5]  Bank Boston lost $171,273 before it uncovered Defendant's alleged scheme.[6]

Defendant agreed to repay Bank Boston and paid Bank Boston $90,759 of the $171,273 he owed.[7]  At this point, Defendant allegedly employed a second, more elaborate "check-kiting" scheme that involved his bank accounts with Pan American, Citizen and Carolina First.[8]

The indictment charges Defendant with two counts of bank fraud.[9]

---

[2] See Indictment at 1 [#1].

[3] See id. at 2-3.

[4] See id.

[5] See id. at 3.

[6] See id.

[7] See id.

[8] See id. at 3-4.

[9] See id. at 5-10.

**Procedural Background**

On August 4, 2004, Defendant was indicted.[10]  On August 11, 2004, Defendant was

arraigned and pleaded not guilty.[11]  Defendant was released pending trial.[12]  On September 7,

2004, however, after discovering that Defendant was operating a restaurant and had a $900,000

bank loan under a different name, the Government requested the revocation of Defendant's

release or revision of his release conditions.[13]  On September 22, 2004, Magistrate Judge Collings

denied the Government's request to revoke the release, but revised Defendant's conditions of

release to include home detention with electronic monitoring.[14]  Before the monitoring could be

implemented, Defendant fled and became a fugitive until the time of his arrest on April 10, 2006,

in Youngstown, Ohio.[15]  According to the Government, Defendant operated restaurants and

engaged in fraudulent activities during his release and subsequent flight.

On September 28, 2006, Defendant filed a <u>Motion Pursuant to 18 U.S.C. § 4241(a),(b),</u>

<u>and Fed. R. Crim. P. 12.2(c)(1)(A) for a Hearing to Determine the Mental Capacity/Competency</u>

<u>of Defendant</u>, accompanied by a report from defense expert Dr. Jerome Rogoff, M.D., and a letter

---

[10] <u>See</u> <u>id.</u> at 13.

[11] <u>See</u> Electronic Clerk's Notes for Proceedings Held Before Judge Robert B. Collings, August 11, 2004.

[12] <u>See</u> <u>id.;</u> <u>Order Setting Conditions of Release</u> [#3].

[13] <u>See</u> <u>Gov't's Mot. to Revoke or Revise Conditions of Def.'s Pretrial Release</u> [#7].

[14] <u>See</u> Order on Gov't's Mot. to Revoke or Revise Conditions of Def.'s Pretrial Release [#10].

[15] <u>See</u> Gov't's Proposed Findings of Fact and Conclusions of Law Relating to Competency 6 [#52] ("Gov't Findings of Fact").

from Dr. William T. Riley, M.D., a physician who treated Defendant in California.[16]  On

November 3, 2006, the Government requested that the court appoint an independent psychiatric

expert to examine Defendant's competence to stand trial.[17]  The court granted that motion and

appointed Dr. Russell George Vasile, M.D., as the expert.[18]  In addition to his own assessment,

Dr. Vasile asked Dr. Mark S. Greenberg, Ph.D., to undertake a neuropsychological evaluation of

Defendant.[19]  On June 8, 2007, Dr. Vasile submitted his report, and on June 19, 2007, Dr.

Greenberg submitted his neuropsychological report.[20]  On August 27, 2007, the Government filed

a Request that Court Find Patel Competent to Stand Trial.[21]  Also on August 27, 2007, Defendant

filed defense expert Dr. Jerome Rogoff's supplemental report that responded to the findings of

Dr. Vasile and Dr. Greenberg.[22]  On September 4, 2007, Defendant filed the affidavit of Robert

Peabody, counsel for Defendant, in support of Defendant's motion.[23]

On September 6, 2007, prior to the Competency Hearing later that day, the Parties jointly

informed the court that in lieu of live testimony at the hearing, they wished to proceed on the

---

[16] Def.'s Mot. for Hr'g;  Rogoff Report (Ex. 2 to Def.'s Mot. for Hr'g) [Sealed #37B]; Riley Letter (Ex. 1 to Def.'s Mot. for Hr'g) [Sealed #37A].

[17] See Gov't's Request for Psychiatric Examination and to Continue the Competency Hr'g [#39].

[18] See Order Appointing Expert [#42].

[19] See Vasile Report at 11 [Sealed #45].

[20] Vasile Report; Greenberg Report [Sealed #46].

[21] Gov't's Request for Competency Finding [#47].

[22] Rogoff Supplemental Report [Sealed #49] ("Rogoff Supp. Report").

[23] Aff. of Robert L. Peabody, Esq. in Supp. of Def.'s Mot. to Determine Mental Capacity/Competency of Def. [#50] ("Peabody Aff.").

written medical reports of the doctors, affidavits submitted to the court and supporting legal memoranda. The court allowed the Competency Hearing to proceed in accordance with this agreement.[24] At the Competency Hearing, both Defendant and the Government presented oral arguments to the court and were questioned by the court.[25] Defendant did not testify, although he had the opportunity to do. The court took the competency determination under advisement.[26]

On September 13, 2006, the Court Reporter completed the transcript of the Competency Hearing and made it available to counsel. The Government and Defendant each filed proposed Findings of Fact and supporting legal memoranda on October 16, 2007, and October 18, 2007, respectively.[27]

**Discussion**

### A.    The Statutory Standard for Competency to Stand Trial

18 U.S.C. § 4241(d) outlines a two-prong legal standard for determination of a defendant's mental competency to stand trial:

> If, after the hearing, the court finds by a *preponderance of the evidence* that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable
>
> > [1] to understand the nature and consequences of the proceedings against him

---

[24] See Transcript of Competency Hr'g at 2-3 [Sealed #51] ("Transcript").

[25] See id. at 3-21.

[26] See id. at 21-22.

[27] See Gov't Findings of Fact [#52]; Def.'s Proposed Findings of Fact Regarding His Competency to Stand Trial [#53] ("Def. Findings of Fact"); Def. Charles Patel's Mem. in Supp. of Proposed Findings of Fact Re: Patel's Competency to Stand Trial [#54] ("Def. Mem. in Supp.")

or

[2] to assist properly in his defense

the court shall commit the defendant to the custody of the Attorney General [for hospitalization] . . . .[28]

Section 4241 adopts the standard articulated by the Supreme Court in <u>Dusky v. United States</u>.[29] There, the Court held that a defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and . . . ha[ve] a rational as well as factual understanding of the proceedings against him."[30]  Although a district court may issue findings with respect to each prong, the First Circuit has noted that a district court "need not parse the definition of 'competency' nor arrive at specific findings as to each component."[31]

### B.     The Burden of Proof

Surprisingly, a question arises regarding whether the Government bears the burden of establishing competency, or the defendant bears the burden of establishing incompetency.  18 U.S.C. § 4241 is silent on this point, noting only that the court must find by a preponderance of

---

[28] Determination of Mental Competency to Stand Trial, 18 U.S.C. § 4241(d) (2006) (emphasis added and spacing modified).

[29] See <u>United States v. Wiggin</u>, 429 F.3d 31, 37 n.8 (1st Cir. 2005).

[30] <u>Dusky v. United States</u>, 362 U.S. 402, 402 (1960) (per curiam).

[31] See <u>Wiggin</u>, 429 F.3d. at 37 (<u>citing</u> <u>United States v. Muriel-Cruz</u>, 412 F.3d 9, 14 (1st Cir. 2005)) (internal quotations omitted).

the evidence that the defendant is incompetent to stand trial.[32]  The legislative history is also

silent.[33]  Lastly, the First Circuit does not appear to have considered the burden of proof issue.

### C.    The Supreme Court's Comment in <u>Cooper v. Oklahoma</u>

The Supreme Court, however, briefly commented on this issue in dicta in <u>Cooper v.</u>

<u>Oklahoma</u>.[34]  In <u>Cooper</u>, the Court held that an Oklahoma statute requiring defendants to prove

incompetence to stand trial by clear and convincing evidence violated a defendant's due process

rights under the Fourteenth Amendment.[35]  In the context of a discussion on the varying burdens

of proof required in the fifty states, the Court noted:

> Indeed, a number of States place no burden on the defendant at all, but rather require
> the prosecutor to prove the defendant's competence to stand trial once a question
> about competency has been credibly raised.  The situation is no different in federal
> court. *Congress has directed that the accused in a federal prosecution must prove*
> *incompetence by a preponderance of the evidence*. 18 U.S.C. § 4241.[36]

As noted, the Court's comment that the "accused in a federal prosecution must prove

incompetence" is dictum.  Obiter dictum is a "remark made or opinion expressed by a judge, in his

---

[32] As noted by Judge John Tinder, "This is in contrast to the clear assignment to the
defendant of the burden of proof with respect to the legal defense of insanity."  <u>United States v.</u>
<u>Riggin</u>, 732 F. Supp. 958, 963 (S.D. Ind. 1990).

[33] Judge Jack Weinstein notes, "Legislative history does little to provide additional
guidance."  <u>United States v. Gigante</u>, 996 F. Supp. 194, 199 (E.D. N.Y. 1997).  He continues,
"The Senate Report simply states: 'Subsection (d) of section 4241 provides that the court must
make a determination with respect to the defendant's competency based upon a preponderance of
the evidence."  <u>Id.</u> (<u>citing</u> Insanity Defense Reform Act of 1984, Sen. R. No. 98-225, at 236,
reprinted in 1984 U.S.C.C.A.N. (98 Stat.) 3182, 3418).

[34] 517 U.S. 348 (1996).

[35] <u>See</u> <u>id.</u>

[36] <u>Id.</u> at 361-362 (emphasis added).

decision upon a cause, 'by the way'—that is, incidentally or collaterally, and not directly upon the

question before the court; or it is any statement of law enunciated by the judge or court merely by

way of illustration, argument, analogy, or suggestion."[37] Dictum is "unnecessary to the decision

in the case and therefore not precedential."[38]  In <u>Cooper</u>, the reference to the federal system was

incidental and unnecessary to the outcome of the case.  The case is about burdens of proof in state

statutes, not in the federal system.  The Court's reference to the federal system, therefore, is only

for the purpose of comparison, with the Court noting that the standard of proof is lower in the

federal system.  Moreover, the point of the Court's comparison is that the federal system has a

lower standard of proof, not the fact that the "accused" has the burden of proof. Additionally, the

Court does not engage in any analysis of Section 4241 when it makes  the statement.  Lastly,

other federal courts have recognized this statement as dictum.[39]

      The First Circuit has indicated that Supreme Court dicta may be authoritative under

certain circumstances.  In <u>McCoy v. Massachusetts Inst. of Technology</u>, the First Circuit adopted

Professor Wright's view "that, in evaluating dicta, much depends on the character of the dictum.

---

      [37] William M. Lile et al., <u>Brief Making and the Use of Law Books</u> 304 (3d ed. 1914), <u>cited in</u> Black's Law Dictionary 1100 (7th ed. 1999).

      [38] <u>Black's Law Dictionary</u> 1100.

      [39] <u>See</u>, <u>e.g.</u>, <u>United States v. Izquierdo</u>, 448 F.3d 1269, 1277 (11th Cir. 2006) ("Moreover, the Supreme Court has stated, albeit in dicta, that the burden of establishing incompetence rests with the defendant.");  <u>United States v. Dodds</u>, 2006 U.S. Dist. LEXIS 13521 at *2 n.1 (D. Ariz. Mar. 24, 2006) ("The Supreme Court has stated in dictum that . . .");  <u>Gigante</u>, 996 F. Supp. at 199 ("Recently, however, the Supreme Court provided guidance, explaining, albeit in dicta, that under Section 4241 it is the accused who must prove incompetence.");  <u>United States v. Sanchez</u>, 38 F. Supp. 2d 355, 368 (D. N.J. 1999) ("Arguably, this language from <u>Cooper</u> is dicta because the case dealt with state burdens of proof in competency hearings, not with the federal statutes establishing the standards and procedures for competency hearings in federal court.").

Mere obiter may be entitled to little weight, while a *carefully considered* statement . . ., though technically dictum, must carry great weight, and may even . . . be regarded as conclusive." [40]  The First Circuit concluded, "federal appellate courts are bound by the Supreme Court's *considered* dicta almost as firmly as by the Court's outright holdings, particularly when, as here, a dictum is of recent vintage and not enfeebled by any subsequent statement."[41]  In a later case, the First Circuit reaffirmed its position, "*Carefully considered* statements of the Supreme Court, even if technically dictum, must be accorded great weight and should be treated as authoritative when . . . badges of reliability abound."[42]

This court does not believe, however, that the Supreme Court's statement in <u>Cooper</u> rises to the level of a "carefully considered statement" recognized by the First Circuit as controlling precedent.  The statement does not appear to be the product of careful consideration by the Court. To the contrary, it "was made in passing, without analysis of § 4241(d), and in an opinion where the Supreme Court noted without objection that numerous states place the burden on the prosecution[,]" not the defendant.[43]  As noted above, the statement is merely incidental to the more comprehensive discussion on the varying standards of proof in the fifty states.  Also as noted above, the point of the comparison is that the federal system has a lower standard of proof, not the fact that the "accused" has the burden of proof.  Furthermore, the Court cites 18 U.S.C. §

---

[40] 950 F.2d 13, 19 (1st Cir. 1991) (<u>citing</u> Charles A. Wright, <u>The Law of Federal Courts</u> § 58, at 374 (4th ed. 1983)) (internal quotations omitted) (emphasis added).

[41] <u>Id.</u> (emphasis added).

[42] <u>United States v. Santana</u>, 6 F.3d 1, 9 (1st Cir. 1993) (emphasis added).

[43] <u>Dodds</u>, 2006 U.S. Dist. LEXIS 13521 at *2 n.1.

4241 as the only support for this statement, and as noted above, the statute is silent on which party has the burden of proof. The Court does not cite any cases in support of the proposition that the accused has the burden of proof. Lastly, this court finds no Supreme Court cases that repeat the comment that the accused has the burden. Accordingly, while the Court's dictum may be considered persuasive, it is not binding on this court.

### D.    Consideration of the Burden of Proof Issue in Other Circuits

Although the Court's dictum is not controlling, and the First Circuit has not addressed the burden of proof issue, other circuits' discussion of the matter may be instructive. But other circuits have either declined to address the issue or are split.

The Second Circuit, after acknowledging that "[t]he federal statute providing for competency hearings does not allocate the burden of proof, and neither the Supreme Court nor this court has decided as a matter of statutory construction whether the government or defendant bears the burden," declined to decide the issue.[44] Several district courts have also declined.[45]

---

[44] United States v. Nichols, 56 F.3d 403, 410 (2nd Cir. 1995). In 1982, however, the Second Circuit had stated:

> In the absence of any indications to the contrary, a defendant charged with criminal behavior is presumed to be mentally competent to stand trial. However, once a defendant's competency has been called into question, either by the defendant or the prosecution expressly raising the issue, or through the presence of "warning signals" which cause the court to raise the question sua sponte, the burden is placed on the prosecution to prove that the defendant is mentally competent to stand trial. Brown v. Warden, Great Meadow Correctional Facility, 682 F.2d 348, 349 (2d Cir. 1982).

[45] See, e.g., United States v. Cockrell, 1997 U.S. Dist. LEXIS 23467 at *5-6 (M.D. Ala. June 11, 1997) ("Fortunately, this court need not resolve these conflicting authorities to decide the matter at bar."); Sanchez, 38 F. Supp. 2d at 368.

The Fourth and Eleventh Circuits have adopted the Supreme Court's statement in Cooper that the accused has the burden of proof. The Fourth Circuit stated that "Under federal law, the defendant has the burden . . . [to show] that the defendant is . . . mentally incompetent," citing 18 U.S.C. 4241 and Cooper.[46]  The Eleventh Circuit also noted, "[A] petitioner raising a substantive claim of incompetency is entitled to no presumption of incompetency and must demonstrate his or her incompetency by a preponderance of the evidence."[47]  Several district courts have also adopted this view.[48]

---

[46] United States v. Robinson, 404 F.3d 850, 856 (4th Cir. 2005) (quoting 18 U.S.C.A. 4241(d) and citing Cooper) (internal quotations omitted).

[47] See, e.g., Battle v. United States, 419 F.3d 1292, 1298 (11th Cir. 2005) (quoting Medina v. Singletary, 59 F.3d 1095, 1106 (11th Cir. 1995) (internal quotations and citations omitted)).

[48] See, e.g., Aparicio-Artiaga v. United States, 2006 U.S. Dist. LEXIS 9741 at * 24 (M.D. Fla. Feb. 16, 2006) ("Petitioner bears the burden of proving by a preponderance of the evidence that he was incompetent to stand trial or plead guilty.") (citing, inter alia, Brattle);  United States v. Vazquez, 2002 U.S. Dist. LEXIS 23734 at *1 (S.D.N.Y. Dec. 10, 2002) ("Defendant bears the burden of proof, by a preponderance of the evidence.") (citing Cooper);  Powell v. United States, 2000 U.S. Dist. LEXIS 10580 at *20 (W.D.N.Y. July 26, 2000) ("Pursuant to 18 U.S.C. § 4241(d), the burden of proof is on the defendant to show by the preponderance of the evidence that he is mentally incompetent to stand trial.");  United States v. Rudisill, 43 F. Supp. 2d 1, 3 (D. D.C. 1999) ("The defendant bears the burden of proof to demonstrate that he lacks the mental competency to stand trial and must do so by a preponderance of the evidence.") (citing Cooper); United States v. Reinhold, 1998 U.S. Dist. LEXIS 2213 at *4 n.2 (S.D.N.Y. 1998) ("the burden is on the party asserting that the defendant is not competent.");  Gigante, 996 F. Supp. at 197 ("Recently . . .  the Supreme Court provided guidance, explaining, albeit in dicta, that under Section 4241 it is the accused who must prove incompetence.") (citing Cooper).

The Third,[49] Fifth[50] and Ninth[51] Circuits, however, take the view that the Government has

the burden of proof to demonstrate competency.[52]  The Fifth Circuit has stated, "*There is no*

*question* that in federal prosecutions, the government bears the burden of proving the defendant's

_____

[49] United States v. Velasquez, 885 F.2d 1076, 1089 (3d Cir. 1989), cert. denied, 494 U.S. 1017 (1990) ("At the competency hearing, the Government has the burden to prove the defendant's competency.") (citing United States v. DiGilio, 538 F.2d 972, 988 (3d Cir. 1976), cert. denied, 429 U.S. 1038 (1977)).  See also DiGilio, 538 F.2d at 988 ("Evidence showing competency must be more persuasive than that showing incompetency.  Of necessity, then, there is no room for a rule of law placing any burden on the defendant.")

[50] United States v. Hutson, 821 F.2d 1015, 1018 (5th Cir. 1987) ("If a meaningful hearing can be held, the state also bears the burden of proof on the issue of competency.");  United States v. Makris, 535 F.2d 899, 906 (5th Cir. 1976) ("There can be no question that in federal criminal cases the government has the burden of proving [a] defendant competent to stand trial at the [competency] hearing . . .").  The operative statute in 1976, however, was 18 U.S.C. § 4244, and not 18 U.S.C. § 4241.  In reviewing Makris, the Eleventh Circuit noted that "Section 4244, while also allowing competency motions to be filed by either the government or the defendant, placed more emphasis on the government's role in filing an incompetency motion.  See 18 U.S.C. § 4244 (1949) . . ." Izquierdo, 448 F.3d at 1277-1278.

[51] United States v. Hoskie, 950 F.2d 1388, 1392 (9th Cir. 1991) ("The government has the burden of demonstrating by a preponderance of the evidence that the defendant is competent to stand trial.").

[52] The Seventh Circuit also took this view in United States v. Teague, 956 F. 2d 1427, 1431 n.10 (7th Cir. 1992) ("We note that once the issue of the defendant's mental competency is raised, the government bears the burden of proving that the defendant is competent to stand trial.).  Two years later, however, the Seventh Circuit noted, "The starting point in all this is the notion that a criminal defendant is presumed to be competent to stand trial and bears the burden of proving otherwise."  United States v. Mogano, 39 F.3d 1358, 1373 (7th Cir. 1994), cert. denied, 515 U.S. 1133 (1995).

competence to stand trial by a preponderance of the evidence."[53]  Several district courts have also adopted this position.[54]

Lastly, one district court recently adopted a burden-shifting approach.  In <u>United States v. Brown</u>, "the government assumed that it had the burden of coming forward and proving competence of the defendant to stand trial  after defendant had made out a prima facie case of incompetency."[55]  The court commented, "This is a sound assumption[,]" and held, "Once the defendant has made a prima facie case of incompetency to stand trial, the burden of coming forward and of proof by a preponderance of evidence that he is competent to stand trial rests on the government."[56]

### E.    The Burden of Proof is on the Government

This court adopts the view of the Third, Fifth and Ninth Circuits.  It is the position of this court that it is the Government's burden to establish competency to stand trial, not the defendant's burden to establish incompetency.  Just as the Government must establish other prerequisites to trial, the Government must establish a defendant's competency.

---

[53] <u>Lowenfield v. Phelps</u>, 817 F.2d 285, 294 (5th Cir. 1987) (citations omitted) (emphasis added).

[54] <u>See</u>, <u>e.g.</u>, <u>United States v. Dodds</u>, 2006 U.S. Dist. LEXIS 13521 (D. Ariz. March 24, 2006) ("Because the Supreme Court's statement is dictum, this Court feels bound to follow the Ninth Circuit rule.");  <u>United States v. Kokoski</u>, 865 F. Supp. 325, 329 (S.D. W. Va. 1994) ("The United States bears the burden of proving that defendant is competent to stand trial."), <u>aff'd</u>, 82 F.3d 411 (4th Cir. 1996).

[55] 2007 U.S. Dist. LEXIS 75105 at *4 (E.D.N.Y. Oct. 10, 2007).

[56] <u>Id.</u>

**The Defendant's Competency Evaluation**

> **A.    The Parties' Positions**

Defendant argues that he is not competent to stand trial.[57]  Defense counsel asserts that Defendant suffers from symptoms of Alzheimer's and dementia.[58]  Defense counsel also asserts that Defendant suffers from significant memory loss that prevents him from recalling events and circumstances surrounding his conduct as alleged in the Indictment.[59]  Lastly, Defendant's symptoms and memory loss will allegedly hinder his ability to assist counsel in assessing and understanding the case against him, and preparing a defense.[60]

The Government asserts that Defendant is competent to stand trial, and is malingering with respect to his alleged conditions.[61]

> **B.    Defendant is Competent to Stand Trial**

The Government has met its burden in establishing that Defendant is competent to stand trial.  This court finds that Defendant is not presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable (1) to understand the nature and consequences of the proceedings against him or (2) to assist properly in his defense.  First, there is persuasive evidence from the court-ordered examination that Defendant is malingering with respect to his alleged dementia symptoms and significant memory loss.  Second, the events

---

[57] See generally Def. Mem. in Supp.

[58] See Def.'s Mot. for Hr'g at 1.

[59] See id.

[60] See id. at 1-2.

[61] See generally Gov't Findings of Fact.

that transpired during Defendant's pretrial release and flight are highly inconsistent with

Defendant's claims of dementia and significant memory loss.  Lastly, Defendant's evidence is

unpersuasive.  Much of Defendant's evidence is ultimately based on unreliable and dubious self-

reporting by Defendant as to his alleged condition.  Moreover, even beyond the self-reporting

problem, the evidence from (1) the court-ordered examination and (2) Defendant's activities and

interactions during his release and flight strongly outweighs all of Defendant's purported evidence

of incompetency.

   The court notes, however, that even if the burden of proof was allocated to Defendant

instead of to the Government, the evidence presented to the court conclusively establishes

Defendant's competence to stand trial.  Accordingly, whether the Government or Defendant bears

the burden would not change the court's conclusion.[62]

### C.    The Court-Ordered Examination and Evidence of Malingering

### 1.    Dr. Vasile's Report

At the joint request of the Parties, the court appointed Dr. Russell G. Vasile, M.D., to

examine Defendant.[63]  Dr. Vasile submitted his report on June 8, 2007, and concluded that there

is no evidence of mental illness that would impair Defendant's ability to cooperate rationally with

---

[62] Indeed, the Supreme Court has noted, "[T]he allocation of the burden of proof to the defendant will affect competency determinations only in a narrow class of cases where the evidence is in equipoise; that is, where the evidence that a defendant is competent is just as strong as the evidence that he is incompetent."  Medina v. California, 505 U.S. 437, 449 (1992) (interpreting California state law).

[63] See Order Appointing Expert [#42].

his attorney, nor is there any evidence to indicate that Defendant would be unable to manifest

appropriate courtroom behavior.[64]

Dr. Vasile also addressed the question of whether Defendant was malingering:

It is noteworthy that the issue of Mr. Patel [sic] malingering cognitive dysfunction has been raised by the government.  The basis of this allegation relates to Mr. Patel's observed conduct related to business dealings and other legal proceedings from 2003-2006. The observed behavior appeared to be *entirely inconsistent with a dementia that was asserted to have had its onset several years before around 2000-2001.*[65]

Dr. Vasile noted, however, that Defendant's competence to stand trial is called into

question by his "apparent inability to recall meaningful details related to his actions that have led

to the indictment against him," which in turn "raises the question of whether he could

meaningfully assist his attorney in his defense."[66]  Dr. Vasile believed that the best way to assess

the alleged memory loss was through neuropsychological testing, and so Dr. Vasile asked Dr.

Mark S. Greenberg, Ph.D., to undertake a neuropsychological evaluation of Defendant.[67]

## 2.    Dr. Greenberg's Neuropsychological Testing

After eight hours of objective testing in March and April of 2007, in which Dr. Greenberg

noted that Defendant demonstrated the "retained ability to carry out prolonged, complex

---

[64] See Vasile Report at 11.

[65] Id. (emphasis added).

[66] See id.

[67] See id.  Defense expert Dr. Rogoff also concluded that neuropsychological testing was the appropriate way to assess the alleged memory loss.  See Rogoff Report at 5.

interactions with me," Dr. Greenberg submitted a fourteen-page report on June 19, 2007.[68]  Dr. Greenberg concluded that Defendant was malingering:

> His reported manifestations are subjective in nature. *His conduct during formal examination was indicative of deliberate malingering*. Aspects of his clinical presentation and his testing protocol are inconsistent with a dementing syndrome and are atypical of Alzheimer's Disease (AD).  There are significant discrepancies in his clinical presentation with some functions too spared, other too impaired, and others simply not suggestive of AD.  I must therefore respectfully disagree with the opinion offered by Drs. Riley and Rogoff . . . .[69]

Dr. Greenberg's specific conclusions included the following:

> With the exception of his frequent references to his inability to remember, he presented an essentially normal mental status.  His ability to communicate, attend, follow instructions and carry on an ongoing dialog were all *grossly intact*.  His non-verbal behavior was unremarkable.  There were *no objective signs of confusion, disorientation or distraction*.

> Though superficially cooperative with the examination, Mr. Patel was clearly *not putting forth his best effort on cognitive testing*.  His self-presentation and pattern of psychometric responses was *simply not credible*.  His testing profile was riddled with inconsistent patterns of responding, atypical and at times ludicrous responses.

>> – *Four out of four* formal, objective tests of motivational artifact were all positive for *invalid responding*. Two additional forced choice memory paradigms revealed levels of performance that were *not credible (even presuming significant memory deficits)*, with chance levels of responding (indicating total absence of memory ability).

>> – Mr. Patel's pattern of responses on many measures was actually much more impaired than that typically seen in patients with documented dementing syndromes.  In contrast, some of his abilities were remarkably spared and much better than expected for someone with mid-stage dementia. Furthermore, some cardinal signs of AD were absent.

>> – His overall level of test performance was markedly discrepant from the intactness of his presentation on interview.

---

[68] See Greenberg Report at 2-3.

[69] Id. at 14 (emphasis added).

> – A repeat of a dementia screening test first performed by Dr. Riley in 2004 revealed actual improvement – whereas significant interval decline would be expected in AD or another progressive neurological process.

> In the context of his indictment on criminal charges, his past anti-social conduct, and the obvious potential personal gain for currently being deemed incompetent to stand trial, it was concluded with a reasonable degree of professional certainty that *Mr. Patel is now actively malingering*. That is, he is *consciously suppressing his true abilities and exaggerating impairment*.[70]

Dr. Greenberg noted, however, that "[t]he affirmative presence of malingering does not however exclude the possibility of underlying cognitive deficits."[71]  In addition, there was no "obvious alternate psychiatric explanation to account for his presentation."[72]

Lastly, and especially relevant to the competency determination, Dr. Greenberg strongly cautioned against relying on Defendant's self-reported symptoms regarding his alleged condition. Dr. Greenberg noted that "[t]he presence of malingering essentially negates the clinical utility of relying on his self-report of symptoms and functional difficulties," and therefore, he "would recommend to the Court that a judgment as to his cognitive acuity be based upon objective signs—not self report."[73]

### 3.    Dr. Vasile's Review of Dr. Greenberg's Report

After reviewing Dr. Greenberg's report, Dr. Vasile concluded that "[t]he results of Dr. Greenberg's neuropsychological testing are consistent with a pattern of malingering of cognitive

---

[70] Id. at 3 (emphasis added).

[71] See id. (emphasis removed).

[72] See id. at 4 (emphasis removed).

[73] See id.

deficits with the intent of presenting test results consistent with dementia."[74]  Dr. Vasile

highlighted some of Dr. Greenberg's findings:

> 1.  Four out of four formal, objective tests of motivations artifact were all positive for
> invalid responding - The VIP Verbal and the VIP Non-Verbal tests, The Rey 15-Item
> Memory Test and the Test of Memory Malingering (TOMM);
>
> 2.  Several other test performance findings were described by Dr. Greenberg as
> "incredulous," including Digit Scan and Reliable Digit Scan, cancellation tests, WAIS-
> III Digit Symbol, and the CVLT-II.[75]

Dr. Vasile also noted that there were "significant inconsistencies in the longitudinal clinical

presentation presented by Mr. Patel."[76]  Moreover, and "[m]ore importantly, it is very difficult to

understand how an individual with a Mini-Mental Status test score of 8 consistent with advanced

dementia established by examination in September 2004 could be negotiating business loans and

seeking new ventures around that period of time and thereafter."[77]  There were also "several other

test findings that are inconsistent with a diagnosis of dementia."[78]

Dr. Vasile also stated that although scores on Mini-Mental Status Examinations (MMSE)

usually "decline over time as dementias tend to be progressive conditions," Defendant's score

*increased* from an 8 when tested in 2004 by Dr. Riley to a 13 when tested in 2007 by Dr.

Greenberg.[79]  In addition, although "patients with dementia frequently show lack of awareness in

---

[74] Vasile Report at 12.

[75] Id.

[76] Id.

[77] Id.

[78] Id.

[79] Id.

their deficits, Mr. Patel reports and recalls his deficits to a very highly unusual degree on the self-report of executive function structured interview he completed on April 30, 2007."[80]

Moreover, Defendant's "behavior while detained . . . has been entirely unremarkable," with "no evidence of confusion, unusual need for day to day assistance or any behavioral dyscontrol."[81]  Although "[p]atients with an established dementia for six to seven years typically require assistance with activities of daily living[,] Mr. Patel has not required such assistance . . ."[82]

Lastly, Defendant's "self-reported six to seven year history of dementia has not presented a longitudinal course consistent with any of the common diseases associated with dementias."[83]

### 4.    Dr. Vasile's Conclusions

Dr. Vasile concluded that "Mr. Patel's neuropsychological testing and clinical presentation are consistent with a pattern of malingered cognitive defects in the services of establishing a diagnosis of dementia."[84]  Dr. Vasile, however, was "unable to precisely define his cognitive status due to his pattern of not elaborating answers to more detailed questions regarding his capacity to assist in his defense."[85]  In other words, Dr. Vasile could not conclusively establish Defendant's competency because of Defendant's pattern of not fully answering questions about his ability to assist in his defense.  Defendants "failure to elaborate responses," however, was

---

[80] Id.

[81] Id.

[82] Id.

[83] Id.

[84] Id. at 13.

[85] Id.

"consistent with the pattern of malingered responses described above."[86]  Dr. Vasile concluded

that he "therefore must leave the final decisions as to Mr. Patel's competence to stand trial in the

hands of the court."[87]

**D.    Activities and Interactions Inconsistent with Defendant's Incompetence Claim**

Defendants' activities and interactions in the years following his alleged dementia

diagnosis belie the claim that Defendant is incompetent to stand trial.  The court agrees with Dr.

Vasile that "[t]he observed behavior appear[s] to be *entirely inconsistent with a dementia* that

was asserted to have had its onset several years before around 2000-2001."[88]

**1.    Interactions with the San Francisco Federal Probation Officer**

As a federal probation officer, Ester Davis ("Davis") supervised Defendant for two years

following his imprisonment for bankruptcy fraud, from August 2002 to August 2004.[89]  During

the course of Defendant's supervised release, Davis met with Defendant twice, and spoke with

Defendant on the phone approximately twelve times.[90]  Davis also met with Defendant for an exit

interview, following the termination of his supervised release.[91]

---

[86] Id.

[87] Id.

[88] Vasile Report at 11 (emphasis added).

[89] See Davis FBI 302 Interview at 1 (Ex 1. to Gov't's Request for Competent Finding) [#47].

[90] See id. at 1.

[91] See id.

According to a Federal Bureau of Investigation ("FBI") interview with Davis, Defendant worked as Vice President of Construction for Fiesta Fresh Mexican Grill, and gave Davis copies of his pay stubs.[92]  Defendant never discussed having any problems with dementia or memory loss, and Davis never observed any signs of impaired memory, dementia or Alzheimer's.[93] Additionally, Davis found Defendant to be very capable and intelligent, and able to take care of himself and his affairs independently.[94]

### 2.    Defendant's Interactions with Rockport National Bank

In the fall of 2003, Defendant met with Maryann Bland ("Bland"), Vice President of Commercial Lending at the Rockport National Bank in Rockport, Massachusetts, regarding financing Defendant's purchase of McT's Lobster House and Tavern ("McT's") in Gloucester, Massachusetts.[95]  According to an FBI interview with Bland, Defendant used the name "Chandan Patel."[96]

According to the Bland interview, after significant negotiations, Bland and Defendant agreed on two loans to finance the McT's purchase, one for the purchase of the property and one

---

[92] See id.

[93] See id. at 2.

[94] See id.

[95] See Bland FBI 302 Interview at 1 (Ex 2. to Government's Request that Court Find Patel Competent to Stand Trial) [#47].  The LoCicero family owned McT's for several years, and had put the restaurant up for sale.  See id.  Bland was the family's banker, and the LoCicero's gave Defendant her name.  See id.

[96] See id.

for the business assets of the restaurant.[97]  The deal also included a $900,000 line of credit.[98]

Defendant allegedly negotiated the loans but did not want to be a guarantor or signer on the

checking account.[99]

After purchasing the restaurant, Defendant remodeled and reopened it in February of

2004.[100]  Since the time of the reopening, Bland visited Defendant several times a week to see

how the business was going.[101]  According to Bland, the two developed a professional

friendship.[102]  During all of Bland's interactions, she found Defendant to be intelligent,

knowledgeable and charming.[103]  Bland also noted that Defendant ran the restaurant and handled

the banking, and that she never had any concerns regarding Defendant's competency or ability to

manage the restaurant.[104]

At some point after Defendant's initial appearance in this case on August 11, 2004, Bland

became aware of a press release from the Department of Justice regarding one Charles Patel Jr.

being indicted for bank fraud.[105]  Bland notice similarities between the individual named in the

---

[97] See id.  The loans were in the name of the Defendant, along with Defendant's son and father.  See id. at 2.

[98] See id. at 1.

[99] See id. at 2.  Defendant, however, eventually conceded to the bank's request.  See id.

[100] See id.

[101] See id.

[102] See id.

[103] See id. at 4.

[104] See id.

[105] See id. at 3.

indictment and "Chandan Patel."[106]  Bland asked Defendant twice if he was the person in the press release, and both times Defendant said he was not and changed the conversation.[107]  On August 22, 2004, the FBI gave Bland a copy of Defendant's booking photograph, which Bland recognized as "Chandan."[108]  The bank subsequently drafted a letter to Defendant requesting that he close his account.[109]  Bland brought this letter to Defendant at McT's and confronted him with the booking photograph.[110]  Defendant apparently knew the reason for the confrontation and agreed to sign the letter.[111]

### 3.    Defendant's Flight and Interactions with Steven Alikakos

When the Government found out that Defendant, as "Chandan Patel," was operating McT's and had a $900,000 line of credit, the Government sought to revoke or revise Defendant's release conditions.[112]  On September 22, 2004, Magistrate Judge Collings denied the Government's request to revoke the release, but revised the conditions of Defendant's release to include home detention with electronic monitoring.[113]  After the court issued the order, the

---

[106] See id.

[107] See id.

[108] See id.; Gov't Findings of Fact at 6.

[109] See id. at 3.

[110] See id.

[111] See id.

[112]  See Gov't's Mot. to Revoke or Revise Conditions of Def.'s Pretrial Release [#7]; Gov't Findings of Fact at 6.

[113]  See Order on Gov't's Mot. to Revoke or Revise Conditions of Def.'s Pretrial Release [#10].

Pretrial Services officer in California allegedly tried repeatedly to contact Defendant to implement the electronic monitoring.[114]  Defendant, however, was not at home and the officer could not locate him.[115]  This was reported, and the court issued an arrest warrant.[116]  At this point, Defendant became a fugitive.[117]

In September of 2005, Steven Alikakos ("Alikakos"), a real estate agent in Toronto, Canada, contacted the United States Attorney's Office for the District of Massachusetts regarding his dealings with "Chuck Patel."[118]  Alikakos specializes in restaurant locations, and met with Defendant on July 29, 2005, to discuss Defendant's interest in opening a restaurant in Toronto.[119]  According to Alikakos, Defendant was "sharp as a tack" and had a very good memory, sharing memories from when he lived in Toronto during the 1970s.[120]  During the July 29 meeting, Defendant described how he was very successful at running several restaurant chains and restaurants in the United States.[121]  Alikakos asked Defendant why he was looking to open a

---

[114] See Gov't Findings of Fact at 6.

[115] See id.

[116] See id.

[117] See id.

[118] See Alikakos FBI 302 Interview at 1 (Ex 3. to Government's Request that Court Find Patel Competent to Stand Trial) [#47].

[119] See id.

[120] See Alikakos Second FBI 302 Interview at 1 (Ex 4. to Government's Request that Court Find Patel Competent to Stand Trial) [#47].

[121] See Alikakos FBI 302 Interview at 1.

restaurant in Canada.[122] Defendant said that he needed a change, which made Alikakos

suspicious.[123]  Alikakos subsequently conducted internet searches on Defendant, and found a 2004

press release from the United States Attorney's Office regarding Defendant.[124]  At this point,

Alikakos contacted the Government.[125]

### 4.    Defendant's Arrest in Youngstown, Ohio

The United States Attorney's Office learned that Defendant was going to appear for a

deposition in a civil case in Youngstown, Ohio in April of 2006.[126]  As noted by the Government,

"He was there to be deposed[,] and "[a]gain, this is someone who claims to be incompetent since

2000.""[127]  When Defendant arrived, he was arrested.[128]

### E.    Defendant's Evidence of Incompetency

### 1.    Dr. Riley's Letter

In connection with pretrial proceedings in this matter, Defendant's former counsel

submitted a letter to the court from Dr. William Riley, M.D., dated June 10, 2004.[129]  Dr. Riley's

brief letter—five sentences in total—stated that he evaluated and treated Defendant for dementia

---

[122] See id.

[123] See id.

[124] See id.

[125] See id.

[126] See Gov't Findings of Fact at 7.

[127] Transcript at 18.

[128] See Gov't Findings of Fact at 7.

[129] See Riley Letter.

in California, and had also prescribed dementia medications for Defendant.[130]  Dr. Riley also said

that he diagnosed the dementia following "[a] thorough examination, review of medical and family

history, and personal interviews with his physician and his wife . . .," and that the Dementia is

"probably Alzheimers meeting all the DSMIV criteria."[131]  Lastly, Dr. Riley believed that

Defendant lacked the "capacity to manage his finances and property in his own best interest," and

the "insight, judgment, capacity to consent to medical treatment or to participate in legal

proceedings."[132]

    Although not reported in Dr. Riley's letter, Defendant claims that he saw Dr. Riley nine

times between March and August of 2004.[133]  Also, according to Defendant, Defendant told Dr.

Riley that he had "lost some memory" during the past two years, and "had trouble remembering

names, dealing with numbers, and was getting lost."[134]  Defendant also allegedly "acknowledged

to Dr. Riley that he needed help from his wife," including bringing the "wrong thing back" from

the store.[135]  Lastly, Defendant allegedly reported that his "memory had been failing him much like

his father's had earlier also who is suffering from Alzheimers."[136]

---

[130] See id.

[131] Id.

[132] Id.

[133] See Def. Findings of Facts at 2.

[134] Id.

[135] Transcript at 4.

[136] Id.

### 2.    Dr. Rogoff's Report

Defense expert Dr. Jerome Rogoff, M.D., met with Defendant in August 2006 to evaluate him psychiatrically.[137]  Part of the evaluation included an interview, and Defendant made statements about, among other things, his alleged condition:

> [Defendant] says that he has not worked for the past three or four years, staying at home and going out only with his wife.  He said that he doesn't work because "I make too many mistakes."  He doesn't drive because he gets lost, except right near home which is familiar.  Any further and he gets lost.  "My memory forgets a lot."  He doesn't go to the supermarket because he brings home "the wrong stuff.  My wife does everything."  He no longer reads because he has had trouble concentrating for the last four or five years . . . He was quite willing to tell me of his lack of ability to function, but he was not eager to claim dementia.  He knows he has a memory, focusing, concentration and attention problem, but he does not think he is demented as his father was.[138]

> Although he can clearly remember events and relationships in the past, he says he has trouble remembering more recent things, and he keeps a written "grid" with needed information on it, but he did not consult it in his interview with me.  He denies any bank fraud and therefore does not know why he is in prison.  Of the charges against him, he says, "They say I owe them money.  Some bank. They paid something.  I owed some money, paid some, some left."  "He (his attorney) told me and I don't remember.  Maybe 50 or 60 thousand.  I don't remember . . . ."[139]

> He was in court, he says, 6 or 8 years ago for "business matters."  He doesn't remember what they were . . . .[140]

Dr. Rogoff also spoke with Defendant's brother, Michael, who told Dr. Rogoff that Defendant had diabetes, but "poor memory makes compliance with treatment poor."[141]

---

[137] See Rogoff Report at 1.

[138] Id. at 2-3.

[139] Id. at 3.

[140] Id.

[141] Id. (Dr. Rogoff describing Michael's statements).

According to Dr. Rogoff, Michael "said that Charles functioned well until four or five years ago."[142]  Dr. Rogoff continued, "Michael said that Dr. Riley had tried to treat Charles's dementia with Aricept (donepezil), which Charles took for six to eight weeks, but to no avail, so he stopped taking it."[143]  According to Michael, Defendant's dementia was rapidly progressing.[144]  Additionally, Defendant allegedly forgot things, like conversations and what to buy at the store.[145]  Michael said, however, that Defendant's "neurological examination was otherwise normal," and that Defendant "had no history of psychiatric illness or treatment before seeing Dr. Riley."[146]

Dr. Rogoff also administered a Mental Status Exam to Defendant.[147]  Defendant apparently gave a number of incorrect answers on the exam, and his "Fund of Knowledge was not consonant with his educational level."[148]  In addition, Defendant "appears somewhat depressed, but he does not show most of the signs and symptoms of a Major Depression."[149]  Instead, "his presentation is more consistent with what is called a Pseudo-Depression of Dementia, meaning that the appearance of emptiness, lack of visible emotion (flat affect) and seeming detachment that

---

[142] Id. (Dr. Rogoff describing Michael's statements).

[143] Id. (Dr. Rogoff describing Michael's statements).

[144] Id. (Dr. Rogoff describing Michael's statements).

[145] Id.

[146] Id. (Dr. Rogoff describing Michael's statements).

[147] See id. at 4.

[148] See id.

[149] Id.

resemble some of the symptoms of depression are caused by dementia."[150]  Dr. Rogoff also

reviewed Dr. Riley's Mini Mental Status Exam of Defendant and Dr. Riley's conclusions with

respect to Defendant.[151]  In addition, Dr. Rogoff spoke to Dr. Riley on the telephone.[152]  Lastly,

Dr. Rogoff also reviewed several prior filings in this case.[153]

 Dr. Rogoff concluded that Defendant suffered from "Dementia of the Alzheimer's type,

and has been for several years, at least since 2001."[154]  Dr. Rogoff noted, however, that although

he concluded that Defendant is demented, "his presentation in a few particulars is atypical: his

ability to recall 2 ½ items after 15 minutes, his willingness to declare his deficits of memory and

functioning."[155]  Dr. Rogoff explains the anomalies by stating,

> These atypical bits of mental functioning are few and consistent with the inconsistency
> of a not-yet-fully-developed demented state. Given Dr. Riley's conclusions after
> seeing Charles nine times, and his increasingly poor functioning as described by him,
> his brother and his wife, and his father's history, it is hard to escape the conclusion
> that he is suffering from a dementing process.[156]

 With respect to Defendant's competency to stand trial, Dr. Rogoff noted, "Although

Defendant can, with some help, understand the workings of a court and a trial, and at least in

general, the consequences to him of a trial and he is willing and able to trust and cooperate with

---

[150] Id.

[151] See id.

[152] See id. at 1.

[153] See id.

[154] Id. at 1-2.

[155] Id. at 4.

[156] Id. at 4-5.

his attorney, his ability to provide that attorney with any meaningful, essential information on which to build a defense case is close to nil."[157]  As a result, Dr. Rogoff concluded that Defendant is not competent to stand trial.[158]  Moreover, because "this conclusion is based on a neuropsychological state that is only going to worsen over time," Dr. Rogoff "ha[s] to conclude that Charles Patel will remain incompetent to stand trial until he dies."[159]

### 3.   Dr. Rogoff's Supplemental Report

In a supplemental report to the court, defense expert Dr. Rogoff challenged some of Drs. Vasile and Greenberg's findings, and disagreed with the conclusion that Defendant is malingering.[160]  Among other things, Dr. Rogoff argued that "[a]pathy is a well-known concomitant of Alzheimer's Disease," and "[i]t is entirely plausible, and I think likely, that Mr. Patel's performance on the verbal VIP is explainable by apathy, and would be consistent with Dr. Greenberg's statements about the test."[161]  Rogoff also argued that Defendant's performance on the non-verbal VIP test could likely be explained by poor attention capacity, poor concentration and apathy, all possible symptoms of Alzheimers.[162]  Rogoff also asserted that "[t]here is no scientific reason to embrace . . . a dichotomy," in which "either Charles Patel is a malinger and not

---

[157] Id. at 5.

[158] See id. at 2, 5.

[159] Id. at 5.

[160] See Rogoff Supp. Report.

[161] Id. at 2.

[162] See id.

demented, or the reverse."[163]  According to Rogoff, "[i]t could be a combination of the two," and "it is entirely possible, and I think the most likely possibility, that Charles Patel has moderate to moderately severe-cognitive decline . . . and also is attempting to exaggerate his deficits to make himself look worse than he is."[164]  Rogoff finished his report by stating, "Taken all together, I still conclude that Charles Patel is not competent to stand trial because he cannot—as opposed to will not—sufficiently and meaningfully assist his counsel in defending him, without which he cannot have a fair trial."[165]

### 4.    Defense Counsel Peabody's Affidavit

Robert Peabody ("Peabody"), counsel for Defendant, in an affidavit to the court, recounts his experiences with Defendant during the course of the representation and concludes that Defendant is unable to assist in his own defense.[166]  According to Defendant's memorandum, "Patel's dementia has compromised his recall of important events eight years ago and at issue in this case."[167]  Peabody states that "Patel remembers painfully little about the events surrounding his failure to comply with the conditions of his pretrial release . . ."[168]  In addition, according to Peabody, Defendant "told me that he had no recall or other memory of his day-to-day handling of

---

[163] Id.

[164] Id.

[165] Id. at 4.

[166] See Peabody Aff.  Peabody also took this position at the Competency Hearing, and in supporting legal memoranda.

[167] Def. Mem. in Support at 8.

[168] Peabody Aff. 1-2.

the bank accounts at issue in 1999,"[169] and could not "provide [Peabody] with information about why the commercial bank accounts in this case were managed the way they were . . ."[170] Defendant also "could not tell me" details about the check deposits and wire transfers at issue in the case.[171]  Additionally, "Patel was similarly unable to recall any specifics (or generalities) about the overall finances of their restaurant operations in 1999 or point to some financial difficult he, his father, or the operation was experiencing at the time that would have prompted Patel (or someone else) to conduct banking activity at such a frenetic pace and, apparently, utilize the 'float' to illegally access more than $170,000 in bank funds."[172]  As a result, "Patel cannot shed any light on the financial condition of his businesses back then to help me identify either a motive or, alternatively, a good reason why the charged activity took place."[173]  According to Peabody, answers to many of these questions are important to representing Defendant in this matter, including, among other things, advising Defendant whether to take a plea, mounting a defense and fashioning affirmative defenses.[174]  Peabody concludes, "Without more, I am left to defend Patel in this matter 'completely in the dark.'"[175]

---

[169] Peabody Aff. 6.

[170] Id. at 9.

[171] Id. at 6.

[172] Id. at 7-8.

[173] Id. at 10.

[174] See id. at 5-8.

[175] Id. at 10.

33

### 5.     Defendant's Comment on Dr. Vasile's Conclusion

Defendant notes that "[Dr.] Vasile could <u>not</u> give the Court a definitive opinion on the issue whether Patel is competent to stand trial leaving that decision, ultimately, to the Court."[176] Defendant explained that "Based on . . . contradictory observations, Vasile was unable to 'precisely define' Patel's cognitive status (memory) mental status or the extent of his Dementia because of Patel's limited responses to that, [sic] later, were provided to Drs. Rogoff, Vasile and Greenberg as part of their own evaluations Vasile's questions about his ability to assist counsel in his defense."[177]

### 6.     Defendant's Response to Probation Officer and Rockport National Bank Interactions

Defense counsel notes, "Patel states that his limited contact with Davis and Bland more than three or four years ago provides no insight into the state of Patel's mental health or the nature and extent of his Dementia then or now."[178]  First, "Neither Davis or Bland are health care professionals."[179]  Additionally, Defendant argues that the time he spent with Officer Davis was "hardly the time required for a federal probation officer, let alone physician, to diagnose Dementia or assess the extent of Patel's cognitive or mental functioning."[180]  Likewise, Defendant argues that "Bland's experience as a commercial banker hardly qualifies her to assess Patel's mental

---

[176] Def. Mem. in Supp. at 5 (emphasis in original).

[177] <u>Id.</u> (emphasis in original)

[178] <u>Id.</u> at 9.

[179] <u>Id.</u>

[180] <u>Id.</u>

health in 2003 or, more pertinently, his mental status and capacity to assist counsel with his defense in 2007."[181]  Lastly, "Patel's capacity to negotiate basic bank financing instruments with Bland . . . was 'standard procedure' for Patel and did not overtax his facilities to engage in routine financial dealings with Bland and her bank."[182]

### F.    The Court's Evaluation of Defendant's Evidence

Defendant's evidence of incompetency is unpersuasive largely because almost all of it derives from self-reporting by Defendant.  The court is highly skeptical of any self-reporting, because of the evidence of malingering.  As noted above, Dr. Greenberg cautioned, "[t]he presence of malingering essentially *negates* the clinical utility of relying on his self-report of symptoms and functional difficulties."[183]

### 1.    Dr. Riley's Letter

Dr. Riley's letter is not very persuasive.  The letter is only five sentences long, and it does not contain any details regarding the doctor's evaluation of Defendant.  In addition, Dr. Riley's dementia diagnosis depends, in part, on "[a] thorough examination" of Defendant, but the court has no information on the contents of this examination.  Moreover, the dementia diagnosis appears to have depended, at least in part, on self-reporting by Defendant of his alleged symptoms.  As noted by Defendant, Defendant *told* Dr. Riley that he had "lost some memory," during the past two years, and "had trouble remembering names, dealing with numbers, and was

---

[181] Id.

[182] Id.

[183] Greenberg Report at 4 (emphasis added).

35

getting lost."[184]  In addition, Defendant allegedly "*acknowledged to* Dr. Riley that he needed help

from his wife," including bringing the "wrong thing back" from the store.[185]  Defendant also

*reported* to Dr. Riley that his "memory had been failing him much like his father's had earlier also

[sic] who is suffering from Alzheimers."[186]  Lastly, with respect to Defendant's statements

regarding his father's purported illness, "his father's diagnosis does not appear to have been

securely established."[187]

### 2.    Dr. Rogoff's Report

Dr. Rogoff's report is also not persuasive largely because of the court's concerns about

Defendant's self-reporting and malingering.  Dr. Rogoff based his dementia diagnosis in part on

his August 2006 interview with Defendant.  During the interview, as noted above, Defendant

made numerous self-reported statements to Dr. Rogoff about his alleged condition and memory

loss.[188]  Again, all of these self-reported statements are not reliable because of the evidence of

malingering.

---

[184] See Def. Findings of Fact at 2.

[185] Transcript at 4 (emphasis added).

[186] Id.

[187] Greenberg Report at 14.

[188] As noted above, these included, among many others, statements such as, "I make too
many mistakes," and "My memory forgets a lot."  Defendant said that he does not drive because
he gets lost, and he does not go to the supermarket because he brings home "the wrong stuff,"
and his "wife does everything."  He said that he had a "memory, focusing, concentration and
attention problem." Defendant "says he has trouble remembering more recent things . . .[,]" and
that he "does not know why he is in prison."  Defendant "was in court, he says, 6 or 8 years ago
for 'business matters[,]'" but "[h]e doesn't remember what they were . . . ."

Furthermore, in his initial report, Dr. Rogoff acknowledges aspects of Defendant's testing performance that are inconsistent with a dementia diagnosis.[189] Dr. Rogoff attempts to explain these inconsistencies by stating that the inconsistencies are few in number and are consistent with a "not-yet-fully-developed demented state."[190] This may or may not be true. The fact remains, however, that these inconsistencies were present. Additionally, these inconsistencies conform with Drs. Vasile and Greenberg's conclusions regarding Defendant's malingering.

In addition, Dr. Rogoff depends in part on Dr. Riley's diagnosis,[191] which, as noted above, the court finds unpersuasive.

Lastly, the court does not accord significant weight to the purported statements of Defendant's brother and wife,[192] and, in any event, the statements fall far short of overcoming the strong evidence in support of Defendant's competency.

### 3. Dr. Rogoff's Supplemental Report

Dr. Rogoff's supplemental report is also unpersuasive. Although there are few certainties in mental health diagnoses, Rogoff's supplemental report is largely speculative. Although it might be "plausible" and "likely" that Defendant's performance on several of the tests can be explained by apathy, there is no evidence that this is what happened during Defendant's testing. Rogoff's

---

[189] See Rogoff Report at 4.

[190] See id.

[191] See id.

[192] Dr. Rogoff and Dr. Vasile both spoke to Defendant's brother on the phone. See id. at 1, 3; Vasile Report at 7. Defendant and Defendant's brother allegedly relayed information about Defendant's wife to Dr. Rogoff. See Rogoff Report at 2-3. Dr. Vasile spoke with Defendant's wife on the telephone. See Vasile Report at 7.

comment that "it is entirely possible, and I think the most likely possibility, that Charles Patel has moderate to moderately severe-cognitive decline . . . and also is attempting to exaggerate his deficits to make himself look worse than he is," is also speculation. There is no evidence from any of the medical professionals that Defendant both (1) has dementia *and* (2) is attempting to exaggerate his dementia-related problems. To the contrary, the court has the report of a neuropsychologist who concludes that the results reflect Defendant's active malingering.

### 4.    Defense Counsel Peabody's Affidavit

The court believes that Defendant told Defense Counsel Peabody that he had a complete lack of recall with respect to the events at issue in this case. The court also understands the difficulties that this poses for Peabody in representing Defendant. Again, however, Defendant's alleged lack of recall is entirely based on Defendant *telling* Peabody that he could not remember. Defendant *told* Peabody that he remembered very little about violating his pretrial release conditions. Defendant *told* Peabody that he could not remember anything about how the bank accounts were handled in 1999, or any details about the relevant check deposits and wire transfers. Likewise, Defendant *told* Peabody that he could not recall specifics about the finances of the restaurant operations or any possible reason for why the alleged activity occurred. Peabody's conclusions regarding Defendant's lack of recall, therefore, are entirely based on dubious self-reporting by Defendant.

### 5.    Defendant's Response to Probation Officer and Rockport National Bank Interactions

First, Defendant's statement that "his limited contact with Davis and Bland more than three or four years ago provides no insight into the state of Patel's mental health or the nature and

extent of his Dementia then or now" is from Defendant himself. The court, therefore, does not accord it significant weight. Additionally, although neither Officer Davis nor bank officer Bland is a health care professional, both individuals personally interacted with Defendant and would have had the opportunity to observe or otherwise become aware of Defendant's alleged symptoms.

Furthermore, although the time Davis spent with Defendant was short, it is significant that Davis reported that Defendant was capable and intelligent, and able to take care of himself and his affairs independently. Moreover, Bland spent a fair amount of time with Defendant, developed a "professional friendship" with him, and found him to be intelligent, knowledgeable and charming. Bland also stated that Defendant ran the restaurant operation, and that she was never concerned about Defendant's competency or abilities. It is also significant that neither Davis nor Bland reported any indications that Defendant suffered from dementia or memory loss.

In addition, even if negotiating financial instruments was "standard procedure" for Defendant, Defendant's interactions with the Rockport National Bank and his management of the McT's restaurant involved complex transactions and operations. The fact remains that Defendant sought to purchase a restaurant and successfully executed a purchase agreement with McT's then-owners. Defendant then negotiated with a senior bank officer for two loans to finance the purchase, and also for a $900,000 line of credit from the bank. Defendant also allegedly had the wherewithal to not want to be a guarantor or signer on the checking account. Lastly, Defendant appeared to have run the restaurant without any problems.

Finally, Defendant's flight and interactions with Steven Alikakos belie Defendant's claimed condition. As noted above, Defendant fled electronic monitoring and home detention and became a federal fugitive. Also, in the fall of 2005, as noted above, Defendant researched the

39

purchase of a restaurant in Canada and met with real estate agent Alikakos in Toronto. In describing his interactions with Defendant, Alikakos noted that Defendant was "sharp as a tack" and had a very good memory.[193]

All of these activities and interactions occurred while Defendant was allegedly suffering from dementia and severe memory loss. Accordingly, the court does not accept Defendant's assertions that these events are not inconsistent with his incompetency claim.

### 6.    Final Note on Defendant's Comment on Dr. Vasile's Conclusions

Dr. Vasile did indeed defer to the court on the final competency decision. At the same time, however, as noted by Defense counsel at the Competency Hearing, "although [Vasile] doesn't give . . . an opinion on the outcome, he does defer to and sort of winks at Dr. Greenberg's conclusion of malingering."[194]  More importantly, the reason that Dr. Vasile could not conclusively establish Defendant's competency was because of Defendant's pattern of not fully answering questions about his ability to assist in his defense. Defendant's own actions, therefore, prevented Dr. Vasile from making the full competency determination. In addition, as noted above, Defendant's "failure to elaborate responses[,]" was "consistent with the pattern of malingered responses described above."[195]

---

[193] See Alikakos Second FBI 302 Interview at 1.

[194] Transcript at 8.

[195] Vasile Report at 13.

**Conclusion**

The Government has easily met its burden of establishing Defendant's competency by a preponderance of the evidence. The evidence from the court-ordered psychiatric examination is highly persuasive. Additionally, Defendant's activities and interactions during his release and subsequent flight strongly belie any claims of incompetency. Moreover, Defendant's own evidence of incompetency is largely unpersuasive, mostly due to the court's concerns about unreliable and dubious self-reporting by Defendant. Even beyond the self-reporting issue, the evidence from (1) the court-ordered examination and (2) Defendant's activities and interactions during his release and flight strongly outweighs all of Defendant's purported evidence of incompetency.

For these reasons, the court finds Defendant COMPETENT to stand trial. A trial date shall be set. Accordingly, the Government's Request that Court Find Patel Competent to Stand Trial [#47] is GRANTED. Defendant's Motion Pursuant to 18 U.S.C. § 4241(a),(b), and Fed. R. Crim. P. 12.2(c)(1)(A) for a Hearing to Determine the Mental Capacity/Competency of Defendant [#35] is ALLOWED as to the holding of the Competency Hearing, and DENIED with respect to Defendant's request that court find Defendant incompetent to stand trial.


IT IS SO ORDERED.


                                                          /s Joseph L. Tauro
                                                    United States District Judge